**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| STACY RUSSELL, JAVIER CASTANEDA, QUEEN STINSON, GARRETT MAGEE and STEPHEN E. RICHEY, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | **CIVIL ACTION NO.: 1:22-cv-02492** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ILLINOIS TOOL WORKS, INC., THE BOARD OF DIRECTORS OF ILLINOIS TOOL WORKS, INC., THE ILLINOIS TOOL WORKS, INC. EMPLOYEE BENEFITS INVESTMENT COMMITTEE and JOHN DOES 1-30. | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, Stacy Russell, Javier Castaneda, Queen Stinson, Garrett Magee and Stephen E. Richey ("Plaintiffs"), by and through their attorneys, on behalf of ITW Savings and Investment Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

**I.      INTRODUCTION**

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Illinois Tool Works, Inc. ("ITW" or "Company"), the Board of Directors of Illinois Tool Works, Inc. and its members during the Class Period[2] ("Board") and the

---

[1]  The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as May 11, 2016 through the date of judgment.

Illinois Tool Works, Inc. Employee Benefits Investment Committee and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

3. The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees,*" *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6. Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7. The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8. Because cost-conscious management is fundamental to prudence in the investment function, the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees.

9. Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last accessed November 29, 2021) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

10.     At all times during the Class Period, the Plan had more than $2.8 billion dollars in assets under management.  At the end of 2020 and 2019, the Plan had over $3.6 billion dollars and $3.3 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the ITW Savings and Investment Plan ("2020 Auditor Report") at 2.

11.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

12.     The Plan is also large in terms of the number of its participants.  At all time during the Class Period the Plan had more than 25,000 participants with account balances. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 194 defined contribution plans (401k, 401a, and 403b) in the country with between 20,000 and 29,999 participants with account balances.

13.     Accordingly, the Plan had substantial bargaining power to negotiate favorable recordkeeping and administration fees.

14.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain

4

funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

15. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

16. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II. JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

18. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

19. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III. PARTIES

**<u>Plaintiffs</u>**

20.     Plaintiff, Stacy Russell ("Russell"), resides in Nunica, Michigan. During her employment, Plaintiff Russell participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below. Plaintiff Russell suffered injury to her Plan account by overpaying for her share of administration and recordkeeping costs. In addition, Plaintiff Russell suffered injury to her Plan account by having to pay for her share of consulting fees to purportedly maintain the funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Russell suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. See, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and is subject to underperforming funds, as alleged below. Id.

21.     Plaintiff, Javier Castaneda ("Castaneda"), resides in Chicago, Illinois. During his employment, Plaintiff Castaneda participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.  Plaintiff Castaneda suffered injury to his Plan account by overpaying for his share of administration and recordkeeping costs. In addition, Plaintiff Castaneda suffered injury to his Plan account by having to pay for his share of consulting fees to purportedly maintain the funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Castaneda suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the expensive funds which were left languishing in the

6

Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. See, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and is subject to underperforming funds, as alleged below. Id.

22. Plaintiff, Queen Stinson ("Stinson"), resides in Kennesaw, Georgia. During her employment, Plaintiff Stinson participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below. Plaintiff Stinson suffered injury to her Plan account by overpaying for her share of administration and recordkeeping costs. In addition, Plaintiff Stinson suffered injury to her Plan account by having to pay for her share of consulting fees to purportedly maintain the funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Stinson suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. See, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and is subject to underperforming funds, as alleged below. *Id*.

23. Plaintiff, Garrett Magee ("Magee"), resides in Walnut Cove, North Carolina. During his employment, Plaintiff Magee participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below. Plaintiff Magee invested in the 2060 Target Date Fund complained of in this matter. Plaintiff Magee suffered injury to his Plan account by overpaying for his share of

7

administration and recordkeeping costs and for being subject to the underperformance and higher volatility of the 2060 Target Date Fund, as discussed below. In addition, Plaintiff Castaneda suffered injury to his Plan account by having to pay for his share of consulting fees to purportedly maintain the funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Castaneda suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. See, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and is subject to underperforming funds, as alleged below. Id.

24.     Plaintiff, Stephen E. Richey ("Richey"), resides in Greenville, South Carolina. During his employment, Plaintiff Richey participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.  Plaintiff Richey invested in the 2030 Target Date Fund complained of in this matter. Plaintiff Richey suffered injury to his Plan account by overpaying for his share of administration and recordkeeping costs and for being subject to the underperformance and higher volatility of the 2030 Target Date Fund, as discussed below. In addition, Plaintiff Castaneda suffered injury to his Plan account by having to pay for his share of consulting fees to purportedly maintain the funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Castaneda suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in

8

the form of an undivided interest against a plan's trust for his or her share of the investment. See, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and is subject to underperforming funds, as alleged below. *Id*.

25.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

26.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

27.     Illinois Tool Works, Inc. ("ITW" or "Company") is the Plan sponsor and a named fiduciary having a principal place of business as 155 Harlem Avenue, Glenview, Illinois.  The December 31, 2020 Form 5500 of the ITW Savings and Investment Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. ITW describes itself as a global industrial company providing components for "state-of-the-art dishwashers, ovens and refrigerators in restaurants and hotels, to automobile components inside vehicles all over the world … ."[4]

---

[4] https://www.itw.com/about-itw/discover-itw/

28.     ITW appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. ITW Savings and Investment Plan as Amended and Restated Effective as of January 1, 2016 ("Plan Doc.") at 34. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.     Accordingly, ITW during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

30.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

31.      ITW, acting through the Board, appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers. Plan Doc. at 34. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

33.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

10

**Committee Defendants**

34.     As discussed above, ITW and the Board appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers. Plan Doc. at 34. As will be discussed below, the Committee fell well short of these fiduciary goals.

35.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

37.     To the extent that there are additional officers, employees and/or contractors of ITW who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, ITW officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.  CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between May 11, 2016 through the date of judgment (the "Class Period").

39.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 25,369 Plan "participants with account balances as of the end of the plan year." 2020 Form 5500 at 2.

40.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

41.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C. Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

42. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

43. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

44. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

13

## VII.    THE PLAN

45.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. 2020 Auditor Report at 4. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

46.    In general, all employees of ITW are eligible to participate as soon as is administratively feasible after their date of hire. *Id.*

### *Contributions*

47.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id*.

48.    With regard to employee contributions: "[p]articipants may contribute amounts from a minimum of 1% to a maximum of 50% of eligible compensation to their pre-tax accounts." *Id*. With regard to matching contributions made by ITW, ITW will make "a matching contribution based on each participant's contribution rate and eligible Plan compensation." *Id*.

49.    Like other companies that sponsor 401(k) plans for their employees, ITW enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at

the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

50. ITW also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51. Given the size of the Plan, ITW likely enjoyed a significant tax and cost savings from offering a match.

### Vesting

52. With regard to contributions made by both participants and ITW: "Participants' interest in their employee and Company matching contribution accounts are fully vested at all times." 2020 Auditor Report at 5.

### The Plan's Investments

53. In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

54. Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

55. The Plan's assets under management for all funds as of December 31, 2020 was $3,626,420,789. 2020 Auditor Report at 2.

### Payment of Plan Expenses

56. During the Class Period, administrative and recordkeeping expenses were generally paid using a combination of charges to the participants and Plan assets. 2020 Auditor Report at 6.

15

## VIII. THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A. The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

57. As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

58. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

59. "The duty to pay reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

**ERISA's Fee Disclosure Rule**

60. In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[7]

61. The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.
[7] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet")

this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

62. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

63. The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

64. A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

65. Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

## B. Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants

66. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping

17

and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

67.     Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.  Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a large defined contribution plan.

68.     There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

 A.  Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

 B.  Multi-channel participant and plan sponsor access (e.g. phone, web);

 C.  Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

 D.  Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

 E.  Participant tax reporting services (e.g., IRS Form 1099-R);

 F.  Participant confirmations, statements, and standard notices;

 G.  Plan-level reporting and annual financial package (excluding IRS Form 5500);

 H.  Participant education (e.g. newsletters, web articles, standard communication materials);

 I.  Plan consulting (e.g., preapproved document services, operational materials);

 J.  Plan consulting (e.g. preapproved document services, operational compliance support).

18

69. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services.

70. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. Recordkeepers for large 401(k) plans such as Vanguard and Fidelity invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services). These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

71. The cost of providing recordkeeping services often depends on the number of participants in a plan. In other words, "[m]ost of the cost of recordkeeping and administration of a 401(k) plan is directly linked to the number of participant accounts within the plan rather than the amount of assets in a participant's account. Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. *See,* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." [8]

---

[8] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.[9]

72.     Each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns. In this manner a participant's account is somewhat similar to a simplified brokerage account with only a few investment positions. As a result, the cost of recordkeeping a participant's account with a balance of $500,000 is the same as for a participant whose account balances is $5,000 in the same plan.

73.     Although the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

74.     Recordkeeping and annual account administration add no monetary value to the account and act solely as a necessary expense decreasing investment returns. There is no rational economic reason for the record keeper, or account administrator to receive increased revenues simply based upon increased investment returns, and increased account balances, or employee additional retirement savings' contributions.

---

[9] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

75.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

76.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

**C. Much Information Regarding the Reasonableness of Fees for Recordkeeping Services Are in the Sole Possession of Defendants**

77.     A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

21

78.     Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years."  These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[10]

79.     Generally, any RFPs, if conducted, would not be made available to plan participants.  Here, through pre-suit discovery, Plaintiffs have been provided certain Plan information. As will be discussed in more detail below, Plaintiffs learned through discovery that an RFP was conducted in 2014. ITW0000428 – ITW0000451, RFP presentation from DiMeo Schneider & Associates dated May 2014 ("2014 RFP"). There is no evidence another recordkeeping RFP took place, let alone, within three to five years of the 2014 RFP.

80.     Additionally, Plaintiffs were provided meeting minutes of the Committee and its sub-committee.  Typically, minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions.  Any related documents or data considered for purposes of the investment review (_e.g._, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized.  Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner. Here, Plaintiffs have not received the minutes from the meeting where the RFP was discussed. Plaintiffs are only in possession of a presentation from the Plan's advisor at the time, DiMeo Schneider & Associates, but lack any meaningful discussion from the Committee in the form of meeting minutes, should they exist, about the RFP. _Id._

---

[10] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," _Cerulli Assoc._, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

81. Nonetheless, reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. In most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

82. In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

83. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

84. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control

23

the Plan's recordkeeping costs, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

**D.      Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Fees**

**1.   There is No Indication Defendants Conducted RFPs at Reasonable Intervals**

85.     As noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP. Although, as discussed above, the Plan did conduct an RFP in 2014, there's no evidence of any further RFP and the Plan's fiduciaries failed to make the best choice for Plan participants based on the 2014 RFP.

86.     Empower served as the Plan's recordkeeper throughout the Class Period. In 2020, Empower was the second largest recordkeeper in the United States as measured by assets being recordkept:

2020 TOP PROVIDERS (RECORDKEEPERS)[11]

| | Top 10, by Total 401(k) Assets ($MM) | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

87.     Here, although the Plan Fiduciaries conducted an RFP in 2014, they failed to select the best alternative and had, apparently, only one year later, raised the amount of the Plan's per

---

[11] *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/

participant recordkeeping costs by $▮ per participant. The 2014 RFP provided two recordkeepers who could have provided this service for only $▮ per participant. However, instead of selecting one of these providers, the Plan apparently selected Putnam which later became Empower, for $▮ per participant. However, inexplicably, in 2015, based on an administrative services contract entered into with Empower, the per participant fee had increased to $▮ and has apparently stayed there until the present without another RFP being conducted.

88.     First, the Plan fiduciaries should have known based on the 2014 RFP, that $▮ per participant was not acceptable since two reputable recordkeepers, namely, ING and Wells Fargo, both offered to provide services for only $▮ and $▮ per participant, respectively. 2014 RFP at 22 and 23.

89.     The recordkeepers in the top ten, as well as Wells Fargo and ING, are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

90.     The fact that the Plan has  stayed with the same recordkeeper, namely Empower since at least 2014, paid the same amount in recordkeeping fees from 2015 to the present, there is little to suggest that Defendants had selected an appropriate recordkeeper based on their initial 2014 RFP and the Plan's fiduciaries should have also been aware that a $▮ fee was unreasonable and should have conducted an additional RFP to insure the plan participants were paying the lowest fee possible. This is true especially given the fact that the Plan may have negotiated and accepted by way of its 2014 RFP a $▮ per participant fee, which may have itself been excessive, with Putnam, which later became Empower, but the final agreement entered into with Empower less than a year later showed $▮ per participant. See the Administrative Services Agreement entered into between ITW and Empower on April 1, 2015 ("Empower Agreement") at Schedule A.

**2. Market Surveys, Form 5500s, and other Sources Noted Below are Reliable Sources for Participants to Determine Whether the Plan's Recordkeeping Fees are Unreasonable**

91.     Here, using revenue sharing to pay the excessive $█ per participant recordkeeping fee resulted in a worst-case scenario for the Plan's participants because it saddled the Plan's participants with above-market administrative and recordkeeping fees throughout the Class Period.

92.     $█ per participant fee when benchmarked against similar plans, is excessive.

93.     During the Class Period, the Plan had at least 25,000 participants and less than $2.8 billion dollars in assets making it eligible for some of the lowest fees on the market.

94.     The Plan should have been able to obtain per participant recordkeeping fees of $26-$29.  This figure is estimated by looking at the following factors: for each of the comparison plans, versus the Plan, the features of the plans, (e.g. vesting, eligibility, distributions), number of plan participants, the number and nature of the investment options, the record keeping and administrative services available and utilized for plans of the size of the comparator and the Plan, the participant services available and utilized for plans of the size of the comparator and the Plan, and the reputation of the record keepers.

95.     Compared to what Empower has charged similarly situated plans, a fee of $████ is the reasonable amount the Plan should have paid for RKA costs.  This amount is of course well below what the Plan actually paid for RKA costs.

96.     In addition to the above, other objective evidence points to the unreasonableness of the Plan's fees.

97.     Looking at recordkeeping costs for plans of a similar size in 2018 shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few plans having between 15,000 than 35,000 participants:

26

| Plan | Participants[12] | Net Assets[13] | PP Fee[14] | Recordkeeper |
|---|---|---|---|---|
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $35 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $35 | Fidelity |
| The Tax Sheltered Annuity Plan of Texas Children's Hospital | 13,950 | $993,649,270 | $30 | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $33 | Fidelity |
| Fed Ex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 17,652 | $770,290,165 | $30 | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $26 | Great-West |
| JBS 401(k) Savings Plan | 19,420 | $374,330,167 | $25 | Great-West |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,552,720,874 | **$23** | T.Rowe Price |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | **$33** | Alight |

98.     **Thu**s, the Plan, with over 25,000 participants and more than 2.8 billion dollars in assets in 2019, should have been able to negotiate a recordkeeping cost in the mid to high $20 range from the beginning of the Class Period to the present.  It is particularly noteworthy that Empower, formerly Great-West, who is the recordkeeper for the Plan, was the recordkeeper for

---

[12] Participants are taken from the 2018 Form 5500 using the conservative number of only those participants with account balances at the year end.

[13] Assets under management are taken from the 2018 Form 5500 using the more conservative number found in the accompanying audited financial statements. In some cases, this number may be understated minimally to account for differences in auditing practices.

[14] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2020) at pg. 27 (defining each service code), *available* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27.

two of the plans identified above where recordkeeping fees were dramatically less than for the Plan being in the $26 range.

**(3)    Market Surveys Demonstrate the Unreasonableness of the Plan's RKA Fees**

99.    Another source of data that underscores the unreasonableness of the RKA costs in this case is data released by NEPC, a consulting group, which recently conducted its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[15]  The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants. *See* Report at 1.

100.    NEPC's survey found that the majority of plans with over 15,000 participants, to use a conservative number, paid slightly over $40 per participant recordkeeping, trust and custody fees.[16] NEPC Report at 10.  Clearly ITW should have been able to negotiate a fee well below this mark. *Id.*

101.    Finally, the Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[17]   Here, given the above facts, the Plan was capable of obtaining much less than $35 per participant.

---

[15] Available at https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf

[16] Trust fees are excluded from the $23-$29 per participant amounts discussed above and suggest that had the NEPC study analyzed only recordkeeping fees, it would have come to a similar conclusion.

[17] Case law is in accord that large plans can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the

102. In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

103. Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

**(E) Defendants Breached Their Fiduciary Duties by Creating, Selecting and Retaining in the Plan's Lineup the Chronically Underperforming ITW Created Target Date Series**

### 1. The Use of Target Date Funds in 401(k) Plans

104. Defendants caused the Plan to include in its menu of investment offerings the materially underperforming series of target date funds created by ITW (hereinafter "ITW Created Target Date Series"), the performance histories of these funds were less than mediocre when compared to their appropriate peer groups primarily because of the homemade nature of the ITW Target Date Series but the funds also lacked appropriate professional fund managers to insure the Series performed in a similar manner to the commercially available target date series.

---

past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

105. Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

106. The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

107. By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years of more.

108. Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

109. An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

110. This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

111. The target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

112. Target date funds are divided into two broad categories based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

113. The ITW Created Target Date Series in the Plan are "Through" funds.

114. Regardless of the type of target date fund, the development of a target date fund's glide path and the corresponding asset allocations are important components of a target date fund. Constructing and maintaining a proper glide path and prudent asset allocation for target date funds is complex, time-consuming, and requires input from actuaries and other qualified investment professionals.

115. Another broad classification of target date funds is "actively" or "passively" managed funds. With an actively managed fund, the portfolio manager attempts to select stocks or bonds to generate investment returns that exceed the relevant benchmark index return. With a passively managed fund, the portfolio manager attempts to mimic the performance of a relevant benchmark index. No discretion or research is needed for passive funds, in contrast to actively managed funds. Because of this, passive or index funds charge a much lower investment management fee and have a lower total "expense ratio" relative to active funds.[18]

116. For all target date funds, diversions from a determined glide path or significant changes in the underlying assets or asset allocations can have an extremely negative impact on

---

[18] The fees of mutual funds and similar investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

wealth aggregation for investors. This impact can be particularly profound for participants in a 401(k) plan. It is well known in the investment industry that 401(k) participants rarely make trades in their 401(k) accounts. A fiduciary, held to the standard of an investment professional, therefore must ensure that an investment option added to a 401(k) plan's suite of investments remains prudent and in the best interest of plan participants.

117. A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants often invest all their retirement assets in a single target date fund that matches their retirement date. Some plans, like the Plans, make target date funds the default selection if plan participants do not select a specific fund within the 401(k) plan's lineup of investments. The use of a plan's target date funds as the default investment option underscores the importance of a prudent and diligent process of monitoring target date funds by plan fiduciaries.

118. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. This process includes a requirement for the fiduciary to regularly evaluate the fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

119. With respect to investment returns, diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

120. The measurement of target date funds against prudently managed alternatives is critical given that these alternatives represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

121. Given the construction and composition of target date funds, diligent investment professionals must perform ongoing analyses and monitoring to ensure that the selected target date funds remains prudent options after their initial selection and insertion into the plan's suite of choices.

122. During periods of underperformance, diligent investment professionals closely analyze the causes of the underperformance through attribution analyses. Causes or contributing factors are identified and analyzed.

123. By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

124. Established target date fund investment managers include, but are not limited to, American Funds, T.Rowe Price and the Fidelity FIAM series. American Funds, Fidelity and T.Rowe have each offered target date funds for nearly 20 years and those target date funds have provided stable investment returns to 401(k) plan participants during that time

**(2)     The ITW Created Target Date Series Chronically Underperformed**

125. At all relevant times, Defendants maintained the authority to exercise control over the Plans' investments, including the Plan's target date fund investment options.

126. At all relevant times during the Class Period, the Plan maintained the ITW Created Target Date Series.

127. In 2020, the Plan held a substantial amount of its assets in the ITW Created Target Date Series. With such a large amount invested in the target date series, the Plan would have been able to choose virtually any available target date series for the Plan.

128.     The ITW Created Target Date Series are the only target date investing options in the Plan. In other words, participants in the Plan who want to invest in a target date strategy have no choice other than the ITW Created Target Date Series.

129.     Defendants were under an obligation under ERISA to carefully vet the ITW Created Target Date Series before creating and selecting them for inclusion in the Plan. Defendants were also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the ITW Created Target Date Series on an ongoing basis thereafter.

**(a) The ITW Created Target Date Series was not Properly Structured to Insure and Carry out the Purpose of a Target Date Series.**

130.     A target date suite typically will consist of a mix of different underlying funds that have different risk and return profiles. As a person's anticipated retirement date approaches, the fund is designed to reduce the percentages of the higher risk investments to make the fund more stable given the nearing retirement date. Conversely, the fund targeted at investors with a 2030 retirement date will have more risk with a potential for greater returns to help a younger investor build his or her nest egg. *See, Id.*

131.     Generally, most target date funds will consist of several underlying mutual funds, some with higher risk and some that are lower risk for those closer to retirement. For example, the 2030 fund might consist of the same 10 mutual funds as the 2060 fund but the 2030 fund will have a greater percentage of its assets invested in the funds with lower risk since a person anticipating retiring in 2030 will want to have a lower risk investment to ensure funds will be available for their retirement.

132.     Here, the Defendants decided to create their own suite of target date funds, a practice which is baffling given the number of excellent target date suites available on the market. Commercially available target date suites are generally managed by individuals with many years of experience in the investment industry. However, the instant funds created by the Defendants

34

failed in at least two respects. First, even though the target date funds are supposed to have different asset allocations, becoming more aggressive as the target date goes further out, 6 different target date funds had the same allocations. Second, 6 different target date funds had the same returns even though target date funds are supposed to become more aggressive as the target date goes further out.

133. Given this, it was clear breach of fiduciary duty to have created these poorly performing target date funds instead of choosing from the many better performing target date suites with expected stability for each expected retirement date.

134. Further, a target date series should begin a gentle decline in risk and returns at no more than 20 years away from a given retirement age. Vanguard, one of the most trusted professional provider of target date funds, wrote an article confirming this. *See*, Target-date fund glide path available on Vanguard's website ("Vanguard Article").[19] The Vanguard Article makes clear that while a target date might be riskier and produce more income when a person is age 20, a properly prepared target date suite will see the fund begin to gently change from higher risk to a more stable investment beginning at age 40 with an expected retirement date of 65.

135. Here, the ITW Created Target Date Series spends an unusually long time at the high risk level, in the above example, until a person reaches approximately the age of 50 as opposed to 40. By exposing the glide path to an extra ten years of risk, participants would have lost savings needed for retirement. As unearthed in discovery in this case, the glide path created by ITW begins its decline approximately 10 years later than the well vetted commercially available target date series. *See*, ITW0004066, Fiducient Advisors, Quarterly Investment Review – Third Quarter 2021 ("Fiducient Report") at page 64. This fact is also confirmed at the end of the Fiducient Report where the ITW Created Target Date Series is compared to the S&P 500s target

---

[19] https://institutional.vanguard.com/investment/strategies/tdf-glide-path.html

date benchmark's glidepath. It's clearly seen, again, that this self-created target date suite spends an inordinate amount of time in the high risk category before abruptly changing its risk profile prior to retirement. *Id* at 68.

136. To make matters worse, ITW provides participants with a guide describing the benefits of investing in its target date suite with the title "Making the Most of Your ITW 401(k) Retirement Plan ("401(k) Guide")". ITW's 401(k) guide describes its target date suite as follows:



ITW's target date suite failed to accomplish any of these goals.

137. The chart below shows the make-up of the target date suite created by ITW from 2040 to 2065:

| Category | Underlying Investment | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
|---|---|---|---|---|---|---|---|
| US Fixed Income | Stable Asset Fund | 0% | 0% | 0% | 0% | 0% | 0% |
| Global Fixed Income | Diversified Bond Fund | 5% | 5% | 5% | 5% | 5% | 5% |
| US Large Cap Equity | Northern Trust S&P 500 | 31% | 31% | 31% | 31% | 31% | 31% |
| US Mid/Small Cap Eq | Mid &Small Co US Stock | 26% | 26% | 26% | 26% | 26% | 26% |
| Foreign Equity | Diversified Foreign Stock | 28% | 28% | 28% | 28% | 28% | 28% |
| TIPS & Commodities | Real Assets Fund | 10% | 10% | 10% | 10% | 10% | 10% |

138. As can be seen from the chart, there was no change in the percentage of funds for any target date year from 2040 to 2065 resulting in the abrupt glide path described above. As discussed above, this is not how a target date suite is expected to perform and is contrary to the goals stated in ITW's own 401(k) Guide.

139. As expected, the performance of the ITW Created Target Date Series funds were identical from 2040 to 2065 and failed to change to become less risky as the funds grew closer to an expected retirement date. The Defendants, as fiduciaries to the Plan, should have recognized

that their target dates were not functioning as stated and should have replaced them at the beginning of the Class Period.

**(2)   The ITW Created Target Date Series Materially Underperformed Relative to Comparator Target Date Funds and Indexes**

140.   The ITW Created Target Date Series consistently underperformed industry-accepted benchmarks for target date funds used by investment professionals.

141.   The ITW Created Target Date Series can be compared to various similar target date funds ("Comparator Funds") as benchmarks. Suitable Comparator funds include the T.Rowe Price Retirement I target date series, the Fidelity FIAM TD  target date series and the American Funds target date series. These three target date series are suitable Comparator Funds to the ITW Created Target Date Series because Morningstar, the most well respected and accepted financial industry fund database places these funds in the Morningstar Lifetime Moderate Index category and the ITW Created Target Date Series is intended to be similar to these products.

142.    A Morningstar Category is assigned by placing funds [*e.g.*, T.Rowe Price Retirement I target date funds and the American Funds target date suite etc.] into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . .  Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate Index category. *Id.*

143.   Further, as Morningstar itself states that it created its categories "to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually

invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier")[20] at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be seeking "growth," but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id.*

144. Another valuable comparator index is the S&P Target Date Index. The S&P Target Date Index is a prominent and widely-accepted target date benchmark for "Through" target date funds. It provides exposure to equities, bonds, and other asset classes.[21] The S&P Target Date Index is used as the primary benchmark for many target date funds throughout the industry. At least one large holder of target date funds in the Lifetime Moderate Index category uses the S&P Target Date Index as the benchmark index held in its 401(k) plan.[22]

145. A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks, to evaluate the performance of the ITW Created Target Date Series as early as the inception of the Class Period, or sooner, and on an ongoing basis thereafter.

146. The performance of the ITW Created Target Date Series lagged behind the performance of the applicable Comparator Funds clearly showing that it was an imprudent choice for the Plan.

147. The 1-, 3- and 5-year averages as of 2020, show that the ITW Created Target Date Series have been historically an imprudent selection. Using appropriate Comparator Funds in the

---

[20] Available at the following web address: https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf. Last accessed on May 12, 2023.

[21] *See, e.g.,* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2035-index/#overview (Factsheet for S&P Target Date 2035 Index) (last visited October 27, 2022).

[22] *See* Complaint in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 1 ¶ 46 (N.D. Ill. Aug. 9, 2019) ("According to Plan documents, the [Walgreen 401(k)] Plan uses the S&P Target Date Index as the investment benchmark for each of the Northern Trust [Focus] Funds." The Northern Trust [Focus] Funds are relevant here because Morningstar places them in the same category, namely, the Lifetime Moderate Index category.

Morningstar LT Mod target date group, the ITW Created Target Date Series was mediocre at best. Here, three target date series from this Morningstar peer group will be analyzed, namely T.Rowe Price Retirement I Date I series, Fidelity FIAM TD series and the American Funds Target Retirement R6 series. As of 2020, the three and five year average returns were consistently superior to any of the ITW Created Target Date Series strongly suggesting the fund should have been replaced based on not only it's glide path but also its performance

148. The performance of the ITW target date funds lagged behind its more than a possible hundred peers in the Morningstar Lifetime Moderat Index as the funds grew closer to an expected retirement date. The Defendants, as fiduciaries to the Plan, should have recognized that their target dates were not functioning as stated and should have replaced them at the beginning of the Class Period. The chart below analyzes the performance of properly performing target date funds as against the ITW Created Target Date Series. These alternates are just a few from many that could have been selected for the Plan.

| | | | |
|---|---|---|---|
| 2040 Target Ret Fund | 18.32% | 10.48% | 11.97% |
| TRP Ret I 2040 I | 18.16% | 11.05% | N/A |
| FIAM TD 2040 Q | 18.54% | 11.25% | 12.65% |
| AM Funds 2040 TD Ret R6 | 18.77% | 11.76% | 12.99% |

| | | | |
|---|---|---|---|
| 2045 Target Ret Fund | 18.32% | 10.48% | 11.97% |
| TRP Ret I 2045 I | 18.72% | 11.29% | N/A |
| FIAM TD 2045 Q | 18.54% | 11.26% | 12.65% |
| Am Funds 2045 TD Ret R6 | 19.21% | 11.96% | 13.22% |
| | | | |
| 2050 Target Ret Fund | 18.32% | 10.48% | 11.97% |
| TRP Ret I 2050 I | 18.72% | 11.30% | N/A |
| FIAM TD 2050 Q | 18.50% | 11.26% | 12.67% |
| Am Funds 2050 TD Ret R6 | 19.42% | 12.12% | 13.36% |

| | | | |
|---|---|---|---|
| 2055 Target Ret Fund | 18.32% | 10.48% | 11.97% |
| TRP Ret I 2055 I | 18.68% | 11.28% | N/A |
| FIAM TD 2055 Q | 18.52% | 11.27% | 12.66% |
| Am Funds 2055 TD Ret R6 | 19.39% | 12.11% | 13.35% |

| 2060 Target Ret Fund | 18.32% | 10.48% | 11.97% |
|---|---|---|---|
| TRP Ret I 2060 I | 18.79% | 11.33% | N/A |
| FIAM TD 2060 Q | 18.54% | 11.26% | N/A |
| Am Funds 2060 TD Ret R6 | 19.44% | 12.11% | 13.35% |

149. It's clear that the ITW Created Target Date Series lagged behind its peers in terms of performance. This fact and the fact that the ITW Created Target Date Series lacked an appropriate glide path are all reasons why the ITW Created Target Date Series should have been replaced with one of the potentially several better preforming funds in the Morningstar Lifetime Moderate Index which lacked the glidepath and performance issues that ITW's self-created series subjected participants to.

## FIRST CLAIM FOR RELIEF
### Breaches of the Fiduciary Duty of Prudence
### (Asserted against the Committee)

150. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

151. At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

152. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

153. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and failed to negotiate reasonable Plan recordkeeping fees.

154. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

155. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

156. The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against ITW and the Board Defendants)**

41

157.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

158.     ITW and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

159.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

160.     The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

161.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing

42

investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

162. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

163. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of

the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated:  July 7, 2023                              **CAPOZZI ADLER, P.C.**

/s/ *Donald R. Reavey*
Donald R. Reavey, Esquire
PA Attorney ID #82498

44

2933 North Front Street
Harrisburg, PA 17110
Email: donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ *Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4101

Counsel for Plaintiffs and the Putative Class

45